Jasen, J.
On October 24,1966, at about 9:45 p.m., the defendant— a mature adult, a high school graduate, music teacher and auxiliary policeman—notified the police that he found the dead body of Miss Susan Reynolds in a vacant second-floor apartment in the building in which he resided. Shortly thereafter two police officers arrived at the scene and confirmed the presence of the body. The defendant told the officers that the victim had been in his apartment for a voice lesson earlier in the day. He explained that at 9:40 p.m. he returned from walking his dog, noticed the apartment door open, entered, found the body, and notified the police.
At approximately 1:30 a.m., the police suggested that defendant and his wife accompany them to "the station house because there were less disturbances. ’ ’ At the police station the defendant was taken to the squad room and was interviewed by various detectives from 2:30 or 3:00 a.m. until about 6:30 a.m. Throughout this session, none of Yukl’s responses implicated him in the murder. Meanwhile, during this period, other persons, known to be friendly with the victim, were brought to the precinct and questioned by the detectives. Also, an individual who had been making threats in the neighborhood was sought out by the police at Bellevue Hospital.
At about 6:45 a.m., the police noticed stains on Yukl’s trousers. When, at the officers’ request, he voluntarily removed his trousers, they also noticed brown stains on his jockey shorts and on his genitals. It was at this point that the police fully admonished him of his constitutional rights to which he responded that he fully understood what was being said to him, that he did not wish to have an attorney present and that he would answer the questions of the officers.
About an hour and 15 minutes after his formal consent to being questioned as a suspect, Yukl admitted that he had sodomized the dead body of Miss Reynolds. A detective wrote a summary of Yukl’s admission and the defendant signed it. *588 Coffee was then served to the defendant and no questions were asked for about 45 minutes.
Thereafter, the questioning resumed, and within two hours, Yukl had fully confessed to the murder of Miss Reynolds. He repeated his confession to an assistant district attorney at about 12:30 p.m., after being once again advised of his rights.
Yukl, who had been charged with murder, first degree, entered a plea of guilty to the crime of manslaughter, first degree, following the denial of his application to suppress the aforementioned statements. This appeal is directed to the intermediate orders denying the application to suppress.
Defendant urges on this appeal that his confessions should have been suppressed because they were obtained as a result of custodial interrogation prior to advising him of his constitutional rights.
The crux of the issue before us is whether the hearing court’s findings, affirmed by the Appellate Division, that the defendant was not in custody prior' to receiving the Miranda warnings and that, after receiving the warnings, he understood and voluntarily waived his rights, are erroneous as a matter of law.
We note at the outset that in reviewing the hearing court’s finding that there was no custodial interrogation prior to the warnings being administered, and that admissions given were voluntary, great deference must be allowed the trier of fact. As we said in People v. Leonti (18 N Y 2d 384, 390), “ [W]here there are conflicting inferences to be drawn from the proof, the choice of inferences is for the trier of the facts. And that choice is to be honored unless unsupported, as a matter of law ”. Our review is limited to the question of whether there was sufficient evidence to support the hearing court’s finding. (People v. Boone, 22 N Y 2d 476.) We conclude that the evidence was sufficient, and, therefore, the judgment should be affirmed.
Miranda v. Arizona (384 U. S. 436) requires that at the time a person is taken into custody or otherwise deprived of his freedom, he must be advised of his constitutional rights.
However, in announcing this far-reaching rule of criminal procedure, the Supreme Court noted that it did not intend the requirement of the warnings to preclude the police from ever asking questions of material witnesses during an investigation *589 without giving the admonitions. As the court noted: ‘ General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present.” (Id., at pp. 477-478.)
In deciding whether a defendant was in custody prior to receiving his warnings, the subjective beliefs of the defendant are not to be the determinative factor. The test is not what the defendant thought, but rather what a reasonable man, innocent of any crime, would have thought had he been in the defendant’s position. (Hicks v. United States, 382 F. 2d 158; see, also, People v. Rodney P. [Anonymous], 21 N Y 2d 1; Williams v. United States, 381 F. 2d 20; Fuller v. United States, 407 F. 2d 1199; State v. Seefeldt, 51 N. J. 472; Conyers, v. United States, 237 A. 2d 838 [D. C. Ct. of App.]; State v. Bower, 77 Wn. 2d 634.) Moreover, the fact that a defendant is being interviewed in the police station does not necessarily mean that he is to be considered “ in custody ”. (United States v. Bird, 293 F. Supp. 1265; Freije v. United States, 408 F. 2d 100; Hicks v. United States, supra.) This is merely one of the factors to be considered in reaching the ultimate conclusion.
Several cases have arisen in recent years which have held that interviews' with the defendant by thé police did not constitute in-custody interrogation even though the interviews may have been of extended duration and in some cases at the police station. In Hicks v. United States (supra), the defendant called the police to report that the man with whom she was living had been stabbed. When the police arrived, they found the man dead from a stab wound in the chest. The defendant told police that the decedent said he had been stabbed by some “ jitterbugs ” during a robbery. In response to a police request, the defendant consented to accompany the officers “ downtown” and give a statement. The interview, which was not preceded by Miranda warnings, consumed about 2 hours and 45 minutes, including several interruptions. A statement was reduced to writing and the defendant signed it. Then, while awaiting a ride home, she blurted out a confession that she had stabbed her husband. The *590 Circuit Court of Appeals for the District of Columbia, applying the test mentioned above, found the defendant not to have been in custody and held the confession admissible.
The court went on to note: ‘ ‘ Advising Appellant they [the police] wanted her to come to Headquarters, rather than ‘ requesting ’ or ‘ inviting ’ her, does not alter our view. [Citations omitted.] An assumption that one is required to cooperate with the police can hardly be equated with an arrest; every citizen has a duty to assist police officers up to the point of self-incrimination. The cooperative innocent person would find it oppressive indeed if courts were to hold every person interrogated must first be taken before a magistrate and subjected to the judicial processes applicable to a person criminally charged”. (382 F. 2d, at p. 161.)
In United States v. Delamarra (275 F. Supp. 1 [U. S. Dist. Ct., D. C.]), money had been reported stolen from a safe at Howard University. Since the safe had not been forced, the police suspected an “ inside job ”. They went to the school to interview employees who had access to the safe’s combination and while there they asked the defendant, a guard, to come into an office to answer a few questions. During the interview the defendant said some things which tended to implicate another guard in the burglary. While the interview continued, one of the interviewers went out to check the defendant’s story. When the story failed to check out, the police confronted the defendant with the discrepancies and he admitted the burglary. Throughout the entire time, no Miranda warnings were given and yet the statement was held admissible and was not considered the product of custodial interrogation.
In State v. Bower (supra), ownership of the car believed driven by the perpetrator of an armed robbery was traced to the defendant. He answered a few questions of the police at his home and then consented to go downtown to continue the interview. On the way downtown he changed his story. Not until they had arrived at the police station did defendant receive any warnings, at which time he confessed. His confession was held not to be the product of custodial interrogation. (See, also, State v. Seefeldt, supra.)
We hold that it may not be said, as a matter of law, that an innocent individual in Yukl’s position (i.e., discoverer of the *591 body, caller of the police, himself an auxiliary policeman being interviewed in his own .station house) would have reasonably considered himself in custody prior to 6:45 a.m.
At that time one of the officers noticed a white stain on defendant’s trousers and asked what it was. Defendant answered that it was merely a cleaning agent. A. detective asked “Do you mind if I look at that stain closer? ”, and Yukl, without further request, dropped and removed his trousers and handed them to the detective. At this point, the police noticed brown stains on his undershorts. Yukl was asked about these stains, and removed his shorts for further inspection. It was then that the police, noticing fecal matter on his body, concluded he had been engaging in criminal conduct, and informed him of his rights. The defendant signed a “ rights form ” in which he acknowledged receiving the Mircmda warnings, and then submitted to having skin scrapings and samples of pubic hair taken. Thereafter his trousers were returned and questioning continued. At about 8:00 a.m., defendant confessed that he had sodomized the body upon finding it.
After a coffee break, questioning resumed and at about 10:00 a.m. defendant confessed that he had gotten into an argument with the victim in his apartment, chased her downstairs, killed her and sodomized the body. Following this confession, defendant was reunited with his wife for about 45 minutes. Subsequently an assistant district attorney arrived, readvised defendant of his constitutional rights and conducted a question and answer session in the presence of a stenographer. The defendant said that he had not told the complete truth in his earlier confession and stated that his wife had advised him to make a complete confession of the entire matter. He thereafter related that when the decedent had come to his apartment for a music lesson, he strangled her as she walked in, dragged the body downstairs and sodomized it.
The testimony on the record supports the conclusion that Yukl voluntarily came down to the police station, voluntarily answered the questions and voluntarily gave up the various articles of clothing. It may not be said, as a matter of law, that prior to receiving the warnings, a man in Yukl’s position would have felt that he was in custody. Although it may be possible that Yukl felt obliged to co-operate with the police in order to *592 maintain Ms facade of innocence, tMs subjective view by the defendant does not require that we find him to have been in custody.
The hearing court, considering all of the circumstances including defendant’s background and the demeanor of the witnesses before it, concluded that defendant was not in custody prior to receiving the warnings and that after receiving the warnings he participated voluntarily in the questioning. There is clearly sufficient evidence in the record to support this conclusion.
Accordingly, the judgment of the Appellate Division should be affirmed.