■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MICHAEL W. CLEVELAND, Appellant. [685 NYS2d 295] —Peters, J. Appeal from a judgment of the County Court of Warren County (Moynihan, Jr., J.), rendered April 3, 1996, upon a verdict convicting defendant of the crime of murder in the second degree.

On August 26, 1995, defendant reported to the State Police that his sister-in-law (hereinafter the victim), who lived in a pop-up camper about 100 feet from the residence that defendant and his wife shared, was missing. The evening before, she had been out drinking with defendant, his wife and four other individuals. The State Police, in conjunction with, *inter alia*, the Warren County Sheriff's Department and the Department of Environmental Conservation, extensively investigated her disappearance by questioning various individuals, canvassing her places of employment and undertaking an extensive grid search in which police officers, canine units and helicopter

surveillance were employed. Beginning the day after defendant reported her missing, he was repeatedly interviewed by the police. On each and every occasion, he cooperated.

On August 27, 1995, the first face-to-face contact between defendant and the police took place at his home. He assented to their request to accompany them to their barracks in the Town of Chester, Warren County. Upon arrival, he was advised of his *Miranda* rights, agreed to the administration of a polygraph test and voluntarily provided blood and hair samples. Thereafter, he was driven, at his own request, to his place of employment in the Town of Bolton, Warren County.

The next contact occurred late in the evening of August 29, 1995 or early in the morning of August 30, 1995 when defendant was walking along a road near exit 24 of the Northway. The police requested that he accompany them to the barracks in Bolton for additional questioning. This time he refused, contending that he was tired. It being apparent that he had consumed alcoholic beverages, they drove him directly to his place of employment where he could sleep. He did, however, agree to come to the barracks the next morning at 10:00 A.M. During that two-hour interview, defendant was advised of his *Miranda* rights, waived them and was reasonably cooperative. He ultimately provided a written statement and agreed to accompany them in their car to retrace his whereabouts during the relevant times prior to the victim's disappearance. After traveling this route with the investigators, they drove him home.

On September 1, 1995, the police again approached defendant who was sitting in his car in a McDonald's restaurant parking lot. They asked him to come to the station to answer additional questions but he refused. When he left McDonald's shortly thereafter, they stopped his vehicle near exit 19 of the Northway and again requested that he accompany them to the barracks, approximately one quarter of a mile away, for questioning. This time, he reluctantly agreed. During questioning, police investigators and defendant discussed his meeting with an attorney earlier that day. When asked if he had hired him, defendant replied that he had not. After several hours of questioning, defendant was returned to his car.

According to the attorney, he had a telephone communication with defendant the next day wherein defendant described being questioned but did not disclose that he had requested or been denied counsel. He further did not indicate that he was subjected to any physical abuse or other coercive conduct other than being pressed to travel to the barracks for questioning. At

no time during that phone conversation did defendant request the attorney's intervention. In fact, within a day of this conversation, defendant and his brother-in-law visited the command post set up by the police and inquired about the progress of their investigation.

Defendant's next contact with the police took place three days later on September 4, 1995 when he was duped into meeting them, instead of his wife, at McDonald's. Again requesting that he accompany them to the barracks in the Town of Wilton, Saratoga County, for additional questioning, he reluctantly agreed to travel with them, leaving his motorcycle in the parking lot. While being transported, he was again advised of his *Miranda* rights and told that the victim's clothes and other objects belonging to her had been found secreted in a rock wall on the property that they had been searching. Convinced that the victim had not voluntarily left the area, the police subjected defendant to additional questioning. He made numerous inculpatory statements, eventually agreeing to divulge the location of her body and drawing a map to enable searchers to find her. Defendant orally confessed to the murder but refused to sign a written statement.

After a four-day suppression hearing, County Court rendered a decision. It discredited defendant's contention that he was never advised of his *Miranda* rights and that he had retained an attorney prior to police questioning. It additionally determined that although there was "frequent contact" between the police and defendant, defendant remained free to leave any interview up until the time of his oral confession. Upon appeal, defendant alleges error in the court's refusal to suppress his confession of September 4, 1995 as well as its refusal to charge the jury on manslaughter in both the first and second degrees. Finally, defendant contends that County Court erred in permitting rebuttal testimony.

Upon our review of the denial of the suppression motion, we note that the choice between conflicting inferences to be drawn from the proof is one given to the trier of fact, a determination which will remain undisturbed unless unsupported as a matter of law (*People v Leonti*, 18 NY2d 384, 390, *cert denied* 389 US 1007). As to defendant's contention that he was in custody prior to the time that he arrived at the barracks in Wilton on September 4, 1995, it is well settled that such determination must be viewed not from the subjective belief of defendant but, rather, "what a reasonable [person], *innocent* of any crime, would have thought had he been in the defendant's position" (*People v Yukl*, 25 NY2d 585, 589 [emphasis supplied], *cert*

*denied* 400 US 851). Considering the totality of the circumstances here presented (*see, People v Tarsia*, 50 NY2d 1; *People v Anderson*, 42 NY2d 35), we conclude that an *innocent* individual in defendant's position would not have reasonably considered himself to be in custody until he made statements implicating himself in the disappearance of the victim (*see, People v Yukl, supra*).

It is evident that defendant and the police were playing a cat and mouse game. Defendant, aware that his wife believed that he had something to do with the disappearance of her sister, cooperated with the police in an effort to feign innocence while simultaneously attempting to determine the extent of the information gleaned by them. The authorities, keenly aware of inconsistencies presented by defendant's explanations, chose to repeatedly question him but never employed physical restraints, isolation or physical intimidation to cause his admissions to be the product of a will overborne. As in *Yukl (supra)*, "[a]lthough it may be possible that [defendant] felt obliged to co-operate with the police in order to maintain his facade of innocence, this subjective view by the defendant does not require that we find him to have been in custody" (*id.*, at 591-592).* Moreover, the fact that he was interviewed in a police station did not, necessarily, mean that he should be considered to be "in custody" (*id.*, at 589).

Addressing County Court's refusal to charge manslaughter in the first and second degrees, we find that while defendant's request meets the first requirement of *People v Glover* (57 NY2d 61, 63), since it is impossible to commit the greater crime without concomitantly committing the lesser crime by the same conduct, defendant failed to satisfy the second requirement. Even viewing the evidence in a light most favorable to defendant (*see, People v Martin*, 59 NY2d 704, 705), no reasonable view of the evidence would allow a finding that he committed the lesser included offense (*see, People v Glover, supra*, at 63) in light of either his pretrial admission that he intentionally drowned the victim or trial testimony to the effect that he hid her, after discovering her death, to avoid the result of an autopsy which would reveal that he had sexual intercourse with her immediately prior to her disappearance.

Finally, we note no error in the admission of the rebuttal

---

* While defendant, citing *People v Grant* (80 AD2d 862, *appeal dismissed* 56 NY2d 611), argues that he should have been told that he could refuse to accompany the police and that he was free to leave, we find little support for his contention that these affirmative representations are essential prerequisites.

testimony of Annie Cleveland after defendant testified that he had no altercation with the victim. She testified that three days after his arrest, defendant called her from jail and told her that while he had hit the victim on the night of her disappearance, when he left the camper she was still alive.

With all remaining contentions reviewed and found to be without merit, we affirm.

Cardona, P. J., Crew III, Yesawich Jr. and Carpinello, JJ., concur. Ordered that the judgment is affirmed.